IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUDITH DOMARACKI, | |
| Plaintiff, | |
| v. | Case No. 18-CV-03214 |
| LOYOLA UNIVERSITY MEDICAL CENTER FEDERAL CREDIT UNION, | Judge Mary M. Rowland |
| Defendant. | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Judith Domaracki ("Domaracki") brings this lawsuit against her former employer, the Loyola University Medical Center Federal Credit Union ("Credit Union"). Count One alleges that the Credit Union discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*, as amended. Count Two alleges that the Credit Union retaliated against her for complaining about this discrimination in violation of the ADEA. Count Three alleges age-based discrimination in violation of the Illinois Human Rights Act ("IHRA"), 775 I.L.C.S. 5/2-102(A). The Credit Union has filed a motion for summary judgment. (Dkt. 60). For the reasons stated below, that motion is granted.

1

## BACKGROUND

The Court sets down the facts in the light most favorable to Domaracki, the non-moving party. *See Matsushita Elec. Indus. Co., LTD v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).[1]

Domaracki began her tenure at the Credit Union in 1993 as an Accounting Clerk II. (Dkt. 1, ¶ 9). She rose through the ranks over the next twenty-five years, becoming an Accounting Clerk III in 1999, Supervisor in 2000, and Coordinator in 2009. (Dkt. 1, ¶¶ 9–11). The Credit Union is controlled by a Board of Directors, (Dkt. 62, ¶ 2), which is headed by Board President Howard Hayes ("President Hayes"). (Dkt. 69, ¶ 15). It is operated by a Manager, Harold Tram ("Tram"). *Id*. Between 2000 and 2016 Domaracki was Tram's only direct report, and all other employees reported to her. (Dkt. 1, ¶ 11). Having worked at the Credit Union for 23 years, Domaracki was its highest paid employee and was entitled to the most vacation time. (Dkt. 1, ¶ 17). At seventy-one, she was also the second-oldest employee, although Tram was sixty-six, Ingrid Wolak was seventy-six, and every Credit Union employee but one was well over forty. (Dkt. 69, Ex. 14, 4; Dkt. 62, App'x 1, Tab 18, 129).

In 2015, Domaracki required time off from work for two hip replacement surgeries. (Dkt. 1, ¶¶ 12–13). She informed the Board that she had trained a

---

[1] Facts from the parties' Local Rule 56.1 Statements of Uncontested Fact are cited by their docket number, accompanied by a paragraph number, exhibit number, or page number. Those statements of fact can be found in the record as follows: Defendant's L.R. 56.1 Statement of Uncontested Material Facts (Dkt. 62); Plaintiff's Response to the Defendant's L.R. 56.1 Statement (Dkt. 69); Plaintiff's L.R. 56.1 Statement of Additional Uncontested Material Facts (Dkt. 69); Defendant's Response to the Plaintiff's L.R. 56.1 Statement of Additional Facts (Dkt. 71). When a responsive filing is cited, the Court has considered both the underlying statement of fact and the opposing party's response.

subordinate, Jacqueline Kirchens ("Kirchens"), to cover her duties while she was on leave after her second hip replacement surgery, and that Kirchens would also be able to replace her when she retired. (Dkt. 69, ¶ 16). Domaracki stated in her deposition that she had casually discussed plans for retirement with Tram and the Board Members, but she could not remember specific conversations and conceded that they never asked her about her age. (Dkt. 69, Ex. 7). Tram and Kirchens deny making any inquiries about her retirement, (Dkt. 62, ¶ 17), but Domaracki believes that other employees overheard her telling customers that she had no plans to retire. (Dkt. 69, Ex. 7, 94). After she returned from her surgeries, Domaracki's next annual performance review stated that she had not met the Credit Union's expectations regarding loans during the previous year. (Dkt. 1, ¶14; Tram Deposition, Dkt. 62, App'x 1, Tab 4, 69–70).

In August of 2015, the Credit Union's Board of Directors met to discuss a reorganization of its employees.[2] (Dkt. 62, ¶ 2). Discussions continued through the fall. (Dkt. 69, Ex. 1). A Board agenda dated October 2015, contained a discussion item: "Is coordinator position needed? — Can this job be redefined, What do you do with current employee?". (Dkt. 69, Ex. 1). Viewing the facts in the light most favorable to Domaracki, the Court finds that at least part of the purpose of the reorganization was to eliminate the Coordinator position and either demote her or terminate her employment.

---

[2] The parties dispute the purpose of the reorganization. Hayes testified that the purpose of the reorganization was to streamline, upgrade technology, increase loans to members, and operate less like a branch of the Medical Center in order to avoid a merger with another financial institution. (Dkt. 62, ¶ 3). Domaracki stated in her deposition that Tram told his subordinates the reorganization was meant to enable him to provide employees with raises. (Dkt. 69, ¶ 3).

In September, a new organizational chart was produced by President Hayes that contained seven new job titles. (Dkt. 62, ¶ 5). It is not clear from the record whether the new organizational chart was intended to include Domaracki. Tram testified that he had her in mind for the Call Center Representative position. Domaracki disputes this and argues that the new organizational chart specifically named every current Credit Union employee except Domaracki, tentatively assigning each of them a new job title. (Dkt. 69, Ex. 4). In that chart, the Call Center Representative position is followed by "Future" rather than the name of a current employee. The Board approved the reorganization to take effect in February of 2016. (Dkt. 62, ¶ 6).

In February, the Credit Union employees were brought together to discuss the reorganization. They were told to apply for any new position for which they felt qualified, except for the position of Loan Officer which would likely be an outside hire. (Dkt. 69, ¶ 6; Dkt. 71, ¶ 5). Domaracki initially applied for five of the positions, all except Call Center Representative.[3] (Dkt. 69, ¶ 7). She was interviewed for these positions by Tram. He asked her about her current job duties and whether she felt she had certain other skills. (Dkt. 71, ¶ 6) (according to Domaracki, Tram asked her "what you do [now], and do you feel you can do this or do that?"). When Tram told Domaracki that she would not be hired for any of those positions, he encouraged her to apply to be the Call Center Representative. (Dkt. 69, ¶ 7). Domaracki applied for

---

[3] Domaracki asserts that she had to "wait several weeks for the job description" for this job. (Dkt. 69, Ex. 3). The Credit Union contends, based on the deposition of President Hayes, that this job description had been created and approved by both the Board and the Human Resources department by February 14, 2016. (Dkt. 71, ¶ 3).

4

and was offered this position. *Id*. She accepted this offer. Her fellow Credit Union employees were each offered, and accepted, new positions. Kirchens, age forty-eight, was given the new position that was most analogous to Domaracki's previous position of Coordinator. (Dkt. 69, Ex. 14). Both parties agree that each employee was qualified for their new role. (Dkt. 69, ¶ 10).

Domaracki filed a complaint with the Medical Center's Human Resources department on July 11, 2016, alleging age-based discrimination during the reorganization. (Dkt. 62, ¶ 10). President Hayes investigated this complaint in his capacity as Tram's direct supervisor and discussed it with Tram.[4] (Dkt. 62, ¶ 11; Dkt. 69, ¶ 38). President Hayes summarized the findings of his investigation in a letter to Domaracki dated September 27, 2016 and reported uncovering no evidence of age-based discrimination. (Dkt. 62, ¶ 12). He also stated in this letter that the Coordinator position, which Domaracki had previously held, was no longer necessary because it predominantly involved the indirect supervision of other employees. (Dkt. 62, ¶ 13).

On October 19, 2016 Domaracki filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging age-based discrimination and retaliation following the internal investigation.[5] (Dkt. 1, ¶ 4; Dkt. 69, ¶ 38). At some

---

[4] Domaracki takes issue with President Hayes's investigation, both because (1) he was himself involved in the reorganization that was being investigated, (Dkt. 69, ¶ 11), and (2) he did not conclude that (or, in Domaracki's opinion, seriously consider whether) her age played a role. (Dkt. 69, ¶ 12). Rather than reviewing Domaracki's personnel file or collecting statements from other employees, he credited Tram's belief that there were better qualified candidates for each of the positions except for Call Center Representative. (Hayes Deposition, Dkt. 62, App'x 1, Tab 2, 84–93). Domaracki decided not to appeal the results of this investigation, because she felt that it had been so one-sided that doing so would be futile. (Dkt. 69, ¶ 14, 20).

[5] Domaracki contends that Tram received a letter from the EEOC sometime after she filed her charge. (Dkt. 69, ¶38). Tram testified that he received the letter, but immediately turned it over to Human

point in October of 2016, Domaracki was offered a promotion from Call Center Representative to Member Specialist III. (Dkt. 69, ¶ 23). The Credit Union viewed this promotion as an olive branch; the new position paid almost as much as the Coordinator position had. (Dkt. 69, ¶ 21). Domaracki's view of this promotion, at least in hindsight, was that she was being set up to fail. *Id*.

This promotion was contingent upon Domaracki receiving training and on an evaluation of her performance, and she accepted those terms. (Dkt. 69, ¶ 22). Kirchens was tasked with coordinating training for Domaracki, and with keeping Tram up to date on her progress. (Dkt. 62, ¶ 28). Her training began as soon as Domaracki accepted the promotion in October, and was initially supposed to last only eight weeks.[6] (Kirchens Deposition, Dkt. 62, App'x 1, Tab 16, 157, 164). But after Domaracki failed to adequately complete that training by February of 2017, Kirchens recommended that she be given additional time to acclimate. *Id*. at 158, 160

On February 3, 2017, the Credit Union (through a Loyola Medical Center attorney) responded to the EEOC charge.

Because Domaracki had filed an internal complaint with Human Resources, that department, along with President Hayes and Tram, supervised her additional training from February onwards. (Dkt. 71, ¶ 11; Hayes Deposition, Dkt. 62, App'x 1, Tab 2, 174–76). Domaracki did not successfully complete this additional training,

---

Resources without reading it. (Tram Deposition, Dkt. 62, App'x 1, Tab 4, 121–24). Whether or not Tram understood that a charge of age-based discrimination had been filed with the EEOC, he was aware that Domaracki had made a similar complaint internally a few months earlier.

[6] Elsewhere Domaracki refers to this as a 90-day training period. (Dkt. 1, ¶ 46).

although she argues that this was because her trainers were "nitpicking." (Dkt. 71, ¶ 29).

During October and November of 2017, Tram received negative feedback about Domaracki's customer service and ability to perform basic job duties, both from other employees and from a marketing consultant. (Dkt. 69, ¶ 22). Around that time, he also became aware that Domaracki was performing transactions in her own account and the accounts of family members, which violated the Credit Union's policies.[7] (Dkt. ¶¶ 30–31). Kirchens and another employee, Juliann Vitale ("Vitale") had been keeping a log of Domaracki's errors. Tram contends that these logs were supposed to be a training aid, and to provide insights into the areas in which Domaracki would need further training. (Tram Deposition, Dkt. 62, App'x 1, Tab 4, 74–75). The factual record does not clearly demonstrate whether Domaracki made more errors than other employees. (Dkt. 71, ¶ 10). Domaracki contends that she did not, while Tram, Vitale, and Kirchens believe that she did. (Tram Deposition, Dkt. 62, App'x 1, Tab 4, 76; Kirchens Deposition, Tab 16, 74–75, 131–34; Vitale Deposition, Tab 18, 61). And while Domaracki asserts that her trainers at times refused to help her correct her errors, they contest this characterization. (Kirchens Deposition, Dkt. 62, App'x 1, Tab 16, 134).

Tram attempted to correct Domaracki's conduct with counseling on July 17, 2017, after Domaracki had been a Member Specialist III for nine months. On January

---

[7] Domaracki testified in her deposition that at least some of these transactions were permissible reimbursements for costs associated with her company cell phone. (Dkt. 69, ¶30).

17, 2018, after fifteen months as Member Specialist III, Domaracki was issued a written warning for failure to fulfill her duties. (Dkt. 69, ¶ 33). She did not dispute the accuracy of the examples set forth in this warning, but she did protest that she was being asked to perform pointless tasks, and that the employees who were supposed to be training her refused to assist her in correcting her errors and provide adequate explanations. *Id*. Domaracki's final warning was dated March 20, 2018, and although she did not dispute that it reflected actual errors on her part, she once again protested that it was unfair that she alone was being monitored and evaluated in this manner.[8] (Dkt. 69, ¶ 34). Domaracki had been a Member Specialist III for 17 months. The EEOC closed its investigation into Domaracki's 2016 charges and issued a Right to Sue letter on February 5, 2018, while she was still employed as a Member Specialist III. (Dkt. 1, ¶ 4). Domaracki filed suit in federal court on March 7, 2018. *Id*. She was involuntarily terminated four months later, on July 17, 2018. (Dkt. 69, ¶ 35). At the time of her termination in 2018, Domaracki was seventy-two (72) years old. (Dkt. 1, ¶ 5). She had been working as a Member Specialist III for twenty-one months.

## **LEGAL STANDARD**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[8] Domaracki did not to appeal any of these sanctions. She contends that she was not aware she could appeal. (Dkt. 69, ¶ 36). The Credit Union asserts that she received emails explaining the appeals procedure. *Id*.

322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). "It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence on which he relies." *Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). Construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted).

## ANALYSIS

### I. ADEA and IHRA Discrimination Claims

The ADEA "prohibits employers from discharging employees because they are 40 years-old or older," *Santangelo v. Crown Cork & Seal USA, Inc.*, 255 F. Supp. 3d 791, 801 (N.D. Ill. 2017) (citing 29 U.S.C. § 623(a)(1)), and the IHRA "prohibits unlawful discrimination against a person on the basis of his age in the employment context." *Id.* (citing 775 Ill. Comp. Stat. 5/1–102, 1–102A). These claims are analyzed together. *See Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659 (7th Cir. 2013). To survive summary judgment, Domaracki must produce evidence from which a jury could infer that her age was the "but for" cause of the purported discrimination.

9

*Santangelo*, 255 F. Supp. at 801 (citations omitted). It is not enough to show that "age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018) (citations omitted) (emphasis in original).

In the Seventh Circuit, an ADEA plaintiff can do that by "introducing direct or circumstantial evidence" that her employer took an adverse action against her because of her age, or she may use "the *McDonnell Douglas* burden shifting approach." *Id*. Domaracki has not presented any direct or circumstantial evidence of age-based discrimination, so the Court will apply the *McDonnell Douglas* framework. This analysis considers whether "(1) [the plaintiff] is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017); *see also Santangelo*, 255 F. Supp. 3d at 801. If a plaintiff is able to make out a prima facie case by satisfying those four requirements, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action, "at which point the burden shifts back" to the plaintiff to submit evidence showing that the reason is pretextual. *Id*.

Whether a plaintiff offers direct evidence or uses the *McDonnell Douglas* framework, the court must then "consider all admissible evidence to decide whether

a reasonable jury could find that the plaintiff suffered an adverse action *because of her age.*" *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 720 (7th Cir. 2018) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (emphasis original).[9]

### A. *McDonnell Douglas* Analysis

Domaracki alleges that she was the victim of age-based discrimination when her position, Coordinator, was eliminated during a reorganization of the Credit Union and she was demoted to Call Center Representative.[10] The Credit Union does not contest that Domaracki was a member of a protected class (*i.e.* that she was over forty), that she was meeting their legitimate expectations while she was a Coordinator, that she was subjected to an adverse employment action when the Coordinator position was eliminated and she was demoted, or that similarly situated younger employees were not subjected to such significant cuts to their pay and responsibilities. She has therefore made out the elements of a prima facie case of age discrimination under the *McDonnell Douglas* framework.

Instead, the Credit Union offers a legitimate non-discriminatory reason for its actions. Namely, that the Coordinator position, which "predominantly involved indirect supervision of the other employees" was no longer needed. (Dkt. 61, 1). The

---

[9] Plaintiff, relying on cases from 1996 and before, cites the wrong legal standard and argues that she has met her burden because "[t]here exists the question of fact for a jury [to determine] what was the basis for the purported decision of Tram to pass over [Domaracki] and follow the September 15, 2015 chart." (Dkt. 68 at 8). The question is whether plaintiff has provided evidence for a rational jury to conclude that she suffered either a demotion or a termination *because of* her age. She has not.

[10] Domaracki challenges her promotion to Member Specialist III and subsequent discipline and termination as retaliatory and alleges that the elimination of the Coordinator position and demotion to Call Center Representative position were discriminatory. (Dkt. 68, 7–8).

11

Board determined the Manager could provide that oversight and "wanted a Team Lead who was technologically proficient." *Id*. To demonstrate that this reason was pretextual, Domaracki must show that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007). Domaracki argues that the Credit Union's purported rational was pretextual based on three sets of facts.

First, Domaracki argues that the Board's actions prior to the reorganization demonstrate that eliminating her position and forcing her out was their only goal. She relies on the fact that "[t]he Board agenda included discussion of the termination of Judy's position, but no other" and that while other employees were tentatively assigned new rolls on the Organization Chart, her name was not included. (Dkt. 68, 3). She also argues Tram joined with the Board and gave her a poor performance review in 2015 in order to justify her eventual demotion, and that he misrepresented the purpose of the reorganization to other employees as a way to increase their salaries all as a part of the plan to force her to retire or into a demotion. *Id*.

These facts, taken as true at the summary judgment stage, *might* suggest that the Board and Tram intended to eliminate the Coordinator position—and that is a stretch. But they do *not* suggest that the Board was engaged in age-based discrimination. They suggest that the Board no longer needed a Coordinator with Domaracki's managerial skillset. Domaracki does not seriously argue to the contrary. Therefore, these facts do not support an inference that the Board or Tram was motivated by the Domaracki's age.

12

Put another way, these facts might satisfy the first prong of the *Perez* test for pretext, but not the second prong. They demonstrate some dishonesty on the part of Tram. He falsely claimed to have had a new position in mind for Domaracki when in fact that roll was unassigned. He criticized her personal performance in the role of Coordinator when in fact the role had become obsolete. And he told anxious staff that increasing salaries was the purpose of the reorganization, when in fact the purpose was to downsize and pay increases were merely a side effect. But this dishonest behavior does not suggest that Tram was targeting Domaracki *because of* her age, so it fails to fulfill the second prong of the *Perez* pretext test. At most, his obfuscation demonstrates poor management skills. This conduct does not undercut the Credit Union's proffered explanation that Domaracki was demoted because she lacked technical skills.

Second, Domaracki argues that Tram's cursory job interviews demonstrate that he was not in fact looking for more technically proficient employees. This argument is not supported by the record. Domaracki herself conceded that Tram had asked her questions about her job duties and her abilities. (Dkt. 71, ¶ 6). Tram had also been supervising Domaracki's work and the work of her colleagues for many years and had first-hand knowledge of their skills. Given that knowledge, it is hardly surprising that Tram had positions in mind his employees before he began the interview process. In that context the tentative assignment of employees to new positions prior to interviews does not suggest pretext. Moreover, he documented the comparative qualifications of every applicant during the reorganization. Tram noted,

13

for example, that while Domaracki has "25 years of experience, she has been far removed from the day to day operations of the front officer work flows." (Dkt. 62, App'x 1, Tab 13). Moreover, Domaracki acknowledges that each employee was qualified for their new position. (Dkt. 69, ¶ 9). The Credit Union chose candidates with fewer years of more relevant front office experience over a candidate with more years of less relevant managerial experience. This is a legitimate reason for the Credit Union's hiring decisions. *See Skiba* 884 F.3d at 724 (finding a legitimate, non-discriminatory reason for refusing to promote plaintiff because plaintiff "either was not qualified for the positions at issue or the individuals ultimately hired were better candidates"). The hiring process was not deceptive and does not suggest that the true motive was age-based discrimination, so it does not qualify as pretextual under *Perez*. 488 F.3d at 777. *See also Teruggi*, 709 F.3d at 660–61 (evidence that "calls into question the wisdom of [a supervisor's] discharge decision" is insufficient to show pretext).

Third, Domaracki takes issue with the way her internal complaints of age-based discrimination were handled and argues that President Hayes was not impartial enough to conduct that investigation. (Dkt. 68, 8). This may be true, and the results of that investigation are not dispositive of Domaracki's claims. But even if the investigation was flawed (and although Domaracki argues it was flawed, there is no evidence that it was), that does not mean that a better investigation would have uncovered age-based discrimination. President Hayes testified that he questioned Tram about the interview process, discussed Domaracki's interview specifically, and

14

determined that in Tram's opinion, her extensive experience as a middle-manager had not given her the technical qualifications to take on a new leadership role after the reorganization. (Hayes Deposition, Dkt. 62, App'x 1, Tab 2, 101–03). He also informed Domaracki in writing that the Coordinator position was no longer necessary because it predominantly involved the indirect supervision of other employees. (Dkt. 62, ¶ 13). None of the facts enumerated above could lead a reasonable jury to conclude that age was the but-for cause of Domaracki's demotion.

### B. *Ortiz* Analysis

Turning now to the entire factual record, Domaracki has failed to carry her burden to produce evidence from which a reasonable jury could conclude that her age was the but-for cause of her demotion. In the Seventh Circuit, even comments by supervisors about a plaintiff's age and retirement plans, made in conjunction with a "sham" interview process, are not enough to demonstrate that age-based discrimination caused an adverse employment action. *See Teruggi*, 709 F.3d at 657, 660–61. Domaracki's evidence does not approach that high bar. She was one of the oldest employees of the Credit Union when she was demoted, but several other factors, such as her technical abilities, her job interview, and her managerial background drove that decision. What she describes is a reorganization motivated by legitimate business goals. None of the evidence presented in this case indicates that age-based discrimination played any role in the reorganization or her demotion and eventual termination.

**II. ADEA Retaliation Claim**

Next, Domaracki alleges that the Credit Union retaliated against her after she filed her internal complaint and her EEOC charge. In order to survive a motion for summary judgment on her ADEA retaliation claim, Domaracki must offer evidence that she (1) engaged in a statutorily protected activity, (2) was subjected to a materially adverse action by her employer, and (3) that there was a causal connection between the activity and the adverse action. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 371 (7th Cir. 2019) ("[u]nder the *Ortiz* approach [to retaliation claims] the evidence would have to establish either a causal connection between [the plaintiff's] protected activity and the adverse action he suffered or else support an inference of retaliatory motive"); *see also Skiba*, 884 F.3d at 718; *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 846 (N.D. Ill. 2017). Filing a charge with the EEOC is undeniably protected activity. An internal complaint about discrimination can also be protected activity. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014). Although Domaracki was promoted and given a raise immediately after filing her internal complaint and contemporaneously with the filing of her EEOC charge, she was later subjected to disciplinary actions such as counseling, warnings, and termination. These actions were materially adverse to her interests, satisfying the second prong. *See Morse v. Illinois Dep't of Corr.*, 191 F. Supp. 3d 848, 861 (N.D. Ill. 2015) ("[a] materially adverse action in the retaliation context is one that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination' had she known beforehand how her employer would

16

respond") (citations omitted). The Credit Union only contests the third prong of Domaracki's retaliation claim, the causal connection between the protected activity and the materially adverse actions.

The Credit Union first asserts Domaracki cannot establish a causal connection because Tram, the manager who disciplined and terminated Domaracki, was not aware that she had taken protected actions. The Court credits Domaracki's assertions that he was aware of the EEOC charge as well as the internal complaint, despite some evidence to the contrary.

More persuasively, the Credit Union argues the time span between the protected activity and the allegedly retaliatory actions is too long to allow a rational jury to find a retaliatory motive. The Court agrees. Domaracki filed her internal complaint in July of 2016, and her EEOC charge in October of 2016. In October she was offered a *promotion* to Member Specialist III, contingent upon completing training. She initially failed to complete that training. Instead of terminating her employment or demote her back to Call Center Representative, the Credit Union offered her additional training.[11] Her first official discipline was not until eight

---

[11] Domaracki argues this additional training was *itself* retaliation, rather than a second chance. (Dkt. 68, 9). It is not clear that additional training in the Member Specialist III roll was materially adverse to Domaracki's interests, since she had agree to it as a condition when she took the promotion. *See Morse v. Illinois Dep't of Corr.*, 191 F. Supp. 3d 848, 861 (N.D. Ill. 2015) ("[a] materially adverse action in the retaliation context is one that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination' had she known beforehand how her employer would respond") (citations omitted). Assuming without deciding that this could be a materially adverse action, however, this argument has several flaws. First, the training was temporally too far removed from her protected activity—the internal complaint and the EEOC charge—to be retaliatory. She was assigned additional training seven months after she filed her internal complaint, and four months after she filed her EEOC charge. Domaracki finds it significant that the additional training was implemented one week after Defendant's attorney filed the Credit Union's response to her EEOC charge but cites no case law for the proposition that legal filings by opposing counsel provide the basis for "protected activity." Second, even if the Credit Union's response were part of her protected activity and the relevant time-span were

17

months later, in July of 2017, when she received counseling. Her employment was terminated in July of 2018—twenty-one months after she filed her EEOC charge, and twenty-four months after she filed her internal complaint.[12] No reasonable jury could find that Domaracki's protected activities caused the adverse actions taken between eight and twenty-four months after her protected activity. Therefore, her retaliation claim fails. *See Seymour-Reed v. Forest Preserve District of DuPage County*, 752 Fed. App'x. 331, 336 (7th Cir. 2018) (four-month period between the protected activity and discharge was insufficient to establish a causal connection between the protected activity and adverse employment action); *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 613 (7th Cir. 2001) ("[m]ore than six months elapsed between [protected activities and termination] cannot establish a causal connection" in an ADEA retaliation claim at summary judgment); *Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 319, 2020 WL 996498, at *23 (N.D. Ill. Mar. 2, 2020) ("ten months [. . .] is too long to infer causation" in an ADEA retaliation case).[13]

---

one week, "suspicious timing alone rarely is sufficient to create a triable issue." *Tomanovich v. City of Indiana Dept. of Transportation*, 457 F.3d at 665 (citation omitted); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("[I]t is clear that 'mere temporal proximity' is not enough to establish a genuine issue of material fact."); *but see Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (jury could infer causation where adverse action occurred one day after employee engaged in protected activity). Third, Domaracki argues elsewhere (and the Court accepts for purposes of this motion) that Tram and Hayes were made aware of the internal investigation and the EEOC charge months prior. There is no evidence at all that they were aware a response to the EEOC charge had been filed one week before they assigned additional training, and no reason to think that the filing of a response would provoke retaliation when knowledge of the charge itself thus far had not. Therefore, the only potentially retaliatory acts are the official disciplinary actions taken by Tram.

[12] Domaracki argues that the fact that she was terminated, rather than simply demoted to Call Center Representative, demonstrates that her employers meant to retaliate against her. (Dkt. 68, 2). This argument ignores how much time had elapsed since her provisional promotion, and how many complaints about her performance had been made in the interim.

[13] The Credit Union also argues that Domaracki's extended training, discipline, and eventual termination were caused by her poor performance. Various employees testified that Domaracki was

18

# **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 60) is granted. The Clerk is directed to enter judgment in the Credit Union's favor and against Domaracki and to terminate the case.

E N T E R:

Dated: February 23, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

---

unable to perform the necessary functions of her job, could not correct her own errors, and behaved inappropriately. Domaracki admits to some mistakes and inappropriate behavior but denies having made more mistakes than other employees. Plaintiff has failed to present evidence of a causal connection between her protected conduct and her discipline or her termination. To the extent her poor performance is undisputed by her, any causal connection becomes even more remote. *See Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 319, 2020 WL 996498, at *18 (N.D. Ill. Mar. 2, 2020) ("[n]o jury could infer age discrimination or retaliation [because] plaintiffs do not effectively dispute the non-discriminatory factors affecting their working conditions [including] the deficiencies in each plaintiff's performance as a store director"); *Coleman v. Donahoe*, 667 F.3d 835, 852 ("It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee.") (citations omitted); *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) ("an employee's complaint [. . .] does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior."). The Court need not base its decision on this argument, given the factual disputes involved.